IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ERIN TUOHEY | : | CIVIL ACTION |
| | : | |
| v. | : | NO.  24-5990 |
| | : | |
| BLOOMIN' BRANDS, INC. d/b/a | : | |
| OUTBACK STEAKHOUSE, INC. | : | |

**MEMORANDUM**

**MURPHY, J.**                                                                                   December 15, 2025

At the Springfield, Pennsylvania Outback Steakhouse on April 2, 2024, there was a rule; it was broken; and all was not just right.  After getting five alcoholic drinks while seated at the bar, one patron fell off his barstool.  Two black staff members helped the patron to his feet, but things kept going downhill, as the white patron began yelling anti-black epithets.  These staff members, along with two additional black staff members, ejected the patron from the restaurant.  One of those staff members tried to put the unruly patron in a headlock, while another threw the patron's phone at the patron, hitting him in the face.  Eventually, the police arrived and finished the job.

But this case is not about the patron.  It is about the bartender who served the patron those five drinks and was fired two days later.  The bartender, Erin Tuohey, violated Outback's rule requiring servers to notify a manager before serving a patron a fourth alcoholic drink.  Outback says that's why it fired her.  Ms. Tuohey alleges that Outback fired her because she is white and was thus the best scapegoat for this racially charged incident.  Under this theory, she brings race discrimination claims against Outback under Title VII of the Civil Rights Act of 1964 and the Pennsylvania Human Relations Act (PHRA).  Outback moves for summary judgment on all claims.  Keen readers already know that the key question is whether Ms. Tuohey

found reasons why a reasonable jury could disbelieve Outback's justification for firing her. She did. Because Outback did not demonstrate that no reasonable jury could find in Ms. Tuohey's favor, we deny Outback's motion.

I.     **FACTUAL BACKGROUND**

In April 2015, Ms. Tuohey began working for Outback Steakhouse, Inc. (Outback)[1] at its Springfield, PA location. DI 29 at ¶ 4. Upon beginning her employment with Outback, Ms. Tuohey signed and acknowledged Outback's Responsible Vending Policy (Alcohol Policy), which requires, in what we will call the "Fourth Drink Policy," "that before a person receive[s] their fourth drink the seller-server must notify the manager upon the order, to make them aware of the amount of drinks served and time frame elapsed before serving the fourth drink to the Customer." *Id.* at ¶ 5(a). The Alcohol Policy states that "[f]ailure to follow these policies is grounds for termination." *Id.* at ¶ 6. During her employment, Ms. Tuohey completed various trainings related to Outback's Responsible Beverage Service. *Id*. at ¶¶ 8-9.

Throughout her nine years as an Outback employee, Ms. Tuohey worked at the Springfield location in various roles, though her last role was as a bartender. *Id.* at ¶ 7. At some points while employed at Outback, Ms. Tuohey held the position of a "Key" employee — *i.e.*, an hourly manager — as well as the Lead Trainer position.[2] *Id.* at ¶¶ 15-17. The record indicates that, as of July 2023, Ms. Tuohey was demoted from the Key position following an investigation into Ms. Tuohey's alleged misconduct, which included allegations that she: (1) took smoke

---

[1] Because Bloomin' Brands, Inc. does business as Outback Steakhouse, Inc., for clarity, we refer to defendant as Outback throughout this opinion.

[2] As a Lead Trainer, Ms. Tuohey would train coworkers for serving and bartending roles. DI 29-3 at 5.

breaks outside while working as a bartender, without alerting anyone; (2) arrived late for shifts and would alter her time accordingly; (3) got into an altercation with a coworker (Johnson), during which Ms. Tuohey called Johnson a "bitch" and "cunt[;]" (4) told another coworker that she wanted to "swing on" Johnson; (4) rang her tables under the bar to avoid sharing tips with the host and server assistants; and (5) had a possible drug problem.  DI 27-12 at 2-5.  Near the end of 2023, Ms. Tuohey voluntarily stepped down from serving as a Lead Trainer.  DI 29 at ¶ 21.

On April 2, 2024, Ms. Tuohey, who is white, was bartending at Outback and was the only bartender on that shift.  *Id.* at ¶ 23.  Three salaried managers, all of whom were black, were on-duty during Ms. Tuohey's shift and responsible for supervising her: Marcus Graham (Manager Graham), Laurence Penn (Manager Penn), and Candis Shedrick (Manager Shedrick).  *Id.* at ¶¶ 24-25.  During her shift, Ms. Tuohey served a male patron (the Guest) five alcoholic drinks, bread and butter, a cheeseburger, and fries.  *Id.* at ¶ 29.  Only after Ms. Tuohey served the Guest his final round of drinks (drinks #4 and #5) did Ms. Tuohey inform a manager, Manager Shedrick, that (1) the Guest was "acting funny" upon his return from the bathroom, (2) she would no longer serve him, and (3) the two male managers (Managers Graham and Penn) should inform the Guest that he would no longer be served because they were more physically capable of handling the Guest.  *Id.* at ¶¶ 30-35.  After returning from the bathroom, the Guest fell off his barstool and to the ground.  *Id.* at ¶ 36.  Managers Graham and Penn physically assisted the Guest onto his feet, offered him a free Uber ride, bread, and water, and told him they would pay his bill.  *Id.* at ¶ 37.  The Guest became belligerent, started yelling racial epithets, and refused to leave the restaurant.  *Id.* at ¶ 38.  After approximately 10-15 minutes of this, two other staff —

3

one a Server Assistant and the other a Server (Server McFarland), both of whom are black — assisted Managers Graham and Penn in carrying the Guest outside of the restaurant. *Id.* at ¶¶ 39-40. The Guest continued to act belligerently, prompting Manager Penn to attempt to put him in a headlock. *Id.* at ¶ 41(a). Manager Penn lost his balance, causing the Guest to fall onto him, such that Manager Penn landed on and injured his knee. *Id.* Server McFarland then threw the Guest's phone at the Guest, hitting the Guest in the face. *Id.* at ¶ 42(a). The police arrived and escorted the Guest from the premises, while Manager Penn went to the hospital for his injury. *Id.* at ¶¶ 43-44.

Two days later, in a virtual meeting between Ms. Tuohey, Jeff Arnold (the Springfield location's Managing Partner), and Kathleen White (the Joint Venture Partner who oversaw the region including the Springfield location), Outback terminated Ms. Tuohey. *Id.* at ¶ 51. White, who made the decision to terminate Ms. Tuohey after consulting Outback's Human Resources staff, informed Ms. Tuohey that they were terminating her because she violated Outback's Fourth Drink Policy when she served the Guest on April 2, 2024. *Id.* at ¶¶ 51-54. No other Outback employees were disciplined regarding the April 2nd incident. *Id.* at ¶ 56(a).

After Ms. Tuohey's termination, other Outback servers at the Springfield location stated they were unaware of Outback's Fourth Drink Policy. *Id.* at ¶ 66. One of them texted Ms. Tuohey after her termination, telling Ms. Tuohey that she also was guilty of violating that policy. *Id.* at ¶ 71. Outback also required its employees — who do not receive annual training on alcohol service to guests and often only receive such training when they commence employment — to sign a copy of the Alcohol Policy following Ms. Tuohey's termination. *Id.* at ¶¶ 69-70. Additionally, in March 2025, Outback terminated a bartender who worked at an Outback in the

4

same market area as Springfield for violating the Fourth Drink Policy. *Id.* at ¶¶ 59-63. The termination of that bartender, who identifies as multiracial, was overseen by the same Human Resources Manager and Business Manager who oversaw Ms. Tuohey's termination. *Id.* at ¶ 64.

In November 2024, Ms. Tuohey filed the instant complaint, alleging race discrimination under both Title VII and the PHRA. DI 1 at 8-9. She claims that Outback terminated her because she is white. *Id.*

## II. MOTION AT ISSUE

Outback seeks summary judgment on all claims, asserting that (1) there is no evidence of race discrimination respecting Ms. Tuohey's termination; (2) Ms. Tuohey's termination was legitimate and nondiscriminatory; and (3) Ms. Tuohey cannot show pretext. DI 27-2 at 6-15. Maintaining that there is no genuine dispute of any material fact, Outback concedes — solely for purposes of its summary judgment motion — that Ms. Tuohey satisfies the first three prongs of her *prima facie* discrimination case: she was (1) a member of a protected class; (2) qualified for her position; and (3) subjected to an adverse employment action. *Id.* at 6-7. But Outback insists there is no evidence of race discrimination, direct or circumstantial, respecting her termination. *Id.* at 7-12.

According to Outback, Ms. Tuohey was terminated because she violated its Fourth Drink Policy. *Id.* at 7, 12; DI 29-1 at 1. Outback argues that Ms. Tuohey cannot demonstrate that any similarly situated employees received more favorable treatment than her under similar conditions. DI 27-2 at 8-11. Rather, Outback highlights that it terminated a similarly situated, multiracial bartender from another location in the same market area, for the same violation of the Fourth Drink Policy, and with the involvement of the same Human Resources and Business

5

Managers involved in Ms. Tuohey's termination. *Id.* at 10-11. Ms. Tuohey's efforts to proffer comparators fail, Outback avers, because she (1) attempts to use managers as comparators, where she admits she was not a manager on April 2nd; and (2) the only relevant comparator is the multiracial bartender terminated for violating the Fourth Drink Policy. DI 29-1 at 6-7. Outback underscores the absence of any factual nexus between Ms. Tuohey's race and her termination in the record; indeed, Outback notes that at least one of the people who recommended her termination did not know her race. DI 27-2 at 11-12.

Even if Ms. Tuohey establishes *prima facie* race discrimination, Outback proffers a legitimate, nondiscriminatory reason for terminating her: Ms. Tuohey violated its Fourth Drink Policy and exercised poor judgment when she served the Guest on April 2, 2024. *Id.* at 12-13. According to Outback, Ms. Tuohey cannot establish that this legitimate, nondiscriminatory reason was mere pretext for race discrimination because (1) Ms. Tuohey offers nothing beyond "suppositions" to argue that Outback's termination decision was discriminatorily motivated; (2) there is no connection between the Guest's racist tirade and Ms. Tuohey's termination or her race; (3) Managing Partner Arnold's comment that someone had to get blamed for the incident did not create a factual dispute regarding racial discrimination; (4) the frequency of staff training respecting the Alcohol Policy, and whether other employees knew about the Fourth Drink Policy, does not create a factual dispute regarding racial discrimination; and (5) the managers' actions during the incident with the Guest comported with Outback's policies, so those individuals were not disciplined for their conduct. *Id.* at 13-15; DI 29-1 at 3-5, 8.

Ms. Tuohey urges us to deny summary judgment because there is sufficient evidence on the record to support her race discrimination claims. DI 28-1 at 5-10. She insists that she

6

established a *prima facie* case of race discrimination by demonstrating that she is a member of a protected class (as a white person), who suffered an adverse employment action, under circumstances giving rise to an inference of racial discrimination. *Id.* at 5-7. Ms. Tuohey highlights that of all the employees involved in the incident, she was the only one who was not black. *Id.* at 7. And she notes that her supervisor, Managing Partner Arnold, told a coworker that Outback had to blame someone for the incident. *Id.* Ms. Tuohey avers that a factfinder could conclude that Outback terminated her because of her race, and did not discipline others because of their race, based on the following facts: (1) defendant took no action against black employees who caused physical harm during the incident; (2) the Guest was white and engaged in racist behavior; (3) the only disciplined employee was white; (4) other Outback employees at the Springfield location were unaware of the Fourth Drink Policy; (5) it is unclear whether Outback employees receive regular training on the Fourth Drink Policy; and (6) approximately five months after Ms. Tuohey filed this lawsuit, someone outside of her protected class was terminated for violating the Fourth Drink Policy, but no other employees had been terminated for violating that policy. *Id.* at 8-9.

### III.    LEGAL STANDARDS

#### A.    Summary judgment

Summary judgment should be granted when the movant demonstrates "that there is no genuine dispute as to any material fact" such that they are "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Genuine issues of material fact refer to any reasonable disagreement over an outcome-determinative fact." *In re Energy Future Holdings Corp.*, 990 F.3d 728, 737 (3d Cir. 2021) (citation modified). When considering a summary judgment

motion, we must "view the record and draw inferences in a light most favorable to the non-moving party." *In re IKON Off. Sols., Inc.*, 277 F.3d 658, 666 (3d Cir. 2002) (citation modified). And we must assess whether "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

**B.     Title VII claims**

Title VII of the Civil Rights Act of 1964 prohibits employers from discriminating against any individual regarding her terms, conditions, compensation, or employment privileges, or otherwise adversely affecting her status as an employee, because of her "race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a).  In determining whether an employer intentionally discriminated against its employee, we look to the burden-shifting, circumstantial evidence test established by *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973).  The *McDonnell Douglas* framework has three stages: (1) the plaintiff must demonstrate a *prima facie* case of discrimination; (2) if the plaintiff succeeds in doing so, the burden of production shifts to the defendant "to articulate some legitimate, nondiscriminatory reason" for its action against the plaintiff; and (3) if the defendant succeeds in articulating such, the plaintiff must then prove, by a preponderance of the evidence, that the defendant's proffered legitimate reasons were mere pretext for discrimination.  *Jones v. School Dist.*, 198 F.3d 403, 410 (3d Cir. 1999) (*citing Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981)).

To establish a *prima facie* case, the plaintiff must establish that: (1) she is a member of a protected class; (2) she was qualified for the position she sought to retain or attain; (3) she suffered an adverse employment action; and (4) the circumstances in which that action occurred could give rise to an inference of intentional discrimination.  *Makky v. Chertoff*, 541 F.3d 205,

214 (3d Cir. 2008) (citation modified).  The plaintiff-employee's burden in proving a *prima facie* case is not high; a *prima facie* case "merely raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." *Sempier v. Johnson & Higgins*, 45 F.3d 724, 728 (3d Cir. 1995) (*citing Furnco Construction Co. v. Waters*, 438 U.S. 567, 577 (1978)) (citation modified).  Though the employee's subjective belief that race impacted her employer's actions is insufficient to demonstrate an inference of discrimination, we may infer discrimination from the employer's more favorable treatment of a similarly situated person outside of the employee's class.  *Rodriguez v. AMTRAK*, 532 Fed. Appx. 152, 153 (3d Cir. 2013) (citation modified). "[W]hether a factor is relevant for purposes of a similarly situated analysis must be determined by the context of each case." *Houston v. Easton Area Sch. Dist.*, 355 Fed. Appx. 651, 654 (3d Cir. 2009).  "In disciplinary cases or in the context of personnel actions, for example, the relevant factors often include a showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Id.* (citation modified).  Though generally the question of whether individuals are similarly situated is a question of fact, reserved for the jury, we may "grant summary judgment if no reasonable jury could find the individuals identified by the plaintiffs were similarly situated." *Hampshire v. Bard*, 793 Fed. Appx. 75, 80 (3d Cir. 2019) (citation modified); *Crawford v. Verizon Pa., Inc.*, 103 F. Supp. 3d 597, 605 (E.D. Pa. 2015) ("Determining who is a similarly-situated employee is a fact-intensive inquiry not readily susceptible to summary judgment.").

If the employee establishes a *prima facie* case of intentional discrimination, the burden of production then shifts to her employer to proffer a legitimate, non-discriminatory reason (LNDR) for its action. *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994). The employer's burden is relatively light; it meets its burden by presenting evidence which, construed as true, would enable the factfinder to conclude that there was a nondiscriminatory reason for the employer's action. *Id.* (citation modified). "The employer need not prove that the tendered reason actually motivated its behavior." *Id.* (citation modified).

If the employer meets its burden in presenting an LNDR for its action against the employee, the burden then shifts back to the employee to overcome the employer's proffered LNDR by a preponderance of the evidence. *Id.* To prevail, the employee must point to direct or circumstantial evidence from which the factfinder could either reasonably (1) disbelieve the employer's proffered LNDR; or (2) believe that an invidious, discriminatory reason was, more likely than not, a determinative or motivating cause of the employer's action. *Id.* at 763-64 (citation modified); *Steele v. Pelmor Labs. Inc.*, 642 Fed. Appx. 129, 134 (3d Cir. 2016) (citation modified). Though the employee need not provide evidence directly contradicting the proffered LNDR, she cannot avoid summary judgment merely by arguing that her employer's LNDR need not be believed. *Fuentes*, 32 F.3d at 764 (citation modified). To survive summary judgment, her evidence rebutting her employer's proffered LNDR must enable the factfinder to reasonably infer that each of the proffered LNDRs was a pretext or *post hoc* fabrication for the employer's action. *Id.* (citation modified). The employee must show "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence . . . and

hence infer that the employer did not act for [the asserted] non-discriminatory reasons." *Id.* at 765 (citation modified). "The plaintiff must show not merely that the employer's proffered reason was wrong, but that it was so plainly wrong that it cannot have been the employer's real reason. . . . The question is not whether the employer made the best, or even a sound, business decision; it is whether the real reason is [discrimination]." *Atkinson v. Lafayette College*, 460 F.3d 447, 454 (3d Cir. 2006).

C.    **PHRA claims**

Akin to Title VII, the PHRA prohibits, *inter alia*, an employer from discriminating against its employee with respect to that employee's discharge or employment terms, conditions, or privileges on the basis of the employee's "race, color, religious creed, ancestry, age, sex, national origin or non-job related handicap or disability or the use of a guide or support animal . . . ." 43 P.S. § 955(a). "[T]he PHRA is to be interpreted as identical to federal anti-discrimination laws except where there is something specifically different in its language requiring that it be treated differently." *Fasold v. Justice*, 409 F.3d 178, 184 n.8 (3d Cir. 2005) (citation modified). "Claims under the PHRA are interpreted coextensively with Title VII claims." *Atkinson*, 460 F.3d at 454 n.6 (citation modified). Thus, we use the same burden-shifting test from *McDonnell Douglas* to evaluate race discrimination claims under the PHRA. *Id.*; *Branch v. Temple Univ.*, 554 F. Supp. 3d 642, 648 (E.D. Pa. 2021) (citation modified).

IV.    **DISCUSSION**

A.    **Outback has not shown that summary judgment is warranted in its favor on the question of whether Ms. Tuohey established a *prima facie* case of race discrimination**

Outback falls short of showing that the record before us (1) contains no genuine disputes

of material fact regarding the question of whether Ms. Tuohey has established a *prima facie* race discrimination case; and (2) that the absence of such a genuine dispute requires summary judgment in Outback's favor.  To prove a *prima facie* case, Ms. Tuohey must establish that the circumstances of her termination "merely raise[] an inference of discrimination."  *Sempier*, 45 F.3d at 728 (citation modified).  Outback concedes, for summary judgment purposes, that Ms. Tuohey establishes the first three prongs of a *prima facie* case — she was a member of a protected class, qualified for her position, and subjected to an adverse employment action. *Makky*, 541 at 214; DI 27-2 at 6-7.  Neither Outback, nor the present record, give us reason to doubt that a reasonable jury could find these prongs met.  The final prong is closer, but this record does not preclude a reasonable jury from finding that the circumstances of Ms. Tuohey's termination give rise to an inference of intentional race discrimination.  *Makky*, 541 at 214.

Construed in the light most favorable to Ms. Tuohey, the record establishes that (1) Ms. Tuohey, the sole white employee involved in the incident with the Guest, was the only employee disciplined for that incident; (2) the other employees involved in the incident were black, four of whom physically carried the Guest outside of the restaurant, one of whom attempted to place the Guest in a headlock, and another of whom threw the Guest's phone at the Guest, hitting him in the face; (3) Joint Venture Partner White admitted that placing a customer in a headlock or throwing a phone at them would be inappropriate;[3] (4) the Guest was yelling anti-black epithets;[4] (5) multiple coworker-servers stated that they were unaware of the Fourth Drink Policy; (6) one coworker-server stated that she previously violated the Fourth Drink Policy; and (7) in the record

---

[3] *See* DI 28-4 at 24:7-18.

[4] *See* DI 29-3 at 74-75.

12

before us, Ms. Tuohey is one of only two employees whom Outback claims it has terminated for violating the Fourth Drink Policy.  A reasonable jury could infer race discrimination on these facts.  Moreover, a reasonable jury could conclude that one or more of the staff involved in the incident with the Guest were similarly situated to Ms. Tuohey, such that their conduct and Outback's reaction to that conduct should be considered when evaluating the existence of discrimination.  *Hampshire*, 793 Fed. Appx. at 80.  Thus, summary judgment is not warranted in Outback's favor.

**B.    Outback has not shown that summary judgment is warranted in its favor on the question of whether its proffered legitimate, non-discriminatory reason for terminating Ms. Tuohey was pretext for race discrimination**

Summary judgment is also not warranted on the question of whether a factfinder reasonably could disregard Outback's proffered LNDR for terminating Ms. Tuohey.  Outback asserts it terminated Ms. Tuohey because she violated the Fourth Drink Policy.  The written policy clearly prohibits serving a customer a fourth alcoholic drink without first notifying a manager.  DI 27-7 at 2.  She admits that she served the Guest five alcoholic drinks before notifying a manager.  DI 29 at ¶ 30(a).  Thus, she admits that she violated the policy, which she signed.  DI 27-7 at 1-4.

But having a meritorious defense is not enough to win a summary judgment motion.  In assessing Outback's summary judgment motion, we must ask whether, when viewed in the light most favorable to Ms. Tuohey, the record reasonably could support a finding that this proffered LNDR was mere pretext for race discrimination.  While Ms. Tuohey's evidence is not overwhelming, she does not need a mountain of evidence or a smoking gun to survive summary judgment.  All she must do is present enough circumstantial evidence for a reasonable jury to

13

doubt, due to "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in Outback's explanation, that Outback really terminated Ms. Tuohey because she violated the Fourth Drink Policy. *Fuentes*, 32 F.3d at 765. Given the evidence described in our *prima facie* discussion, we believe a reasonable jury could have such doubt and conclude, by a preponderance of the evidence, that Outback's proffered LNDR was mere pretext for race discrimination. Accordingly, summary judgment on this question is not warranted.

## V. CONCLUSION

Because there are genuine disputes of material fact, we deny summary judgment on both Ms. Tuohey's Title VII and PHRA claims.